Filed 1/13/21  P. v. Walker CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>DEON TRENAIL WALKER,<br><br>Defendant and Appellant. | F078766<br><br>(Super. Ct. No. F18903147)<br><br>**OPINION** |

### THE COURT[*]

APPEAL from a judgment of the Superior Court of Fresno County.  Timothy A. Kams, Judge.

Sylvia W. Beckham, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Erin Doering, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]     Before Meehan, Acting P.J., Snauffer, J. and DeSantos, J.

Defendant Dion Trenail Walker was convicted of the murder of Daniel Patrick Apodaca.  On appeal, defendant contends the trial court abused its discretion in admitting lay witness testimony of a nonpercipient witness police officer narrating video evidence of the murder.  The People contend the trial court did not abuse its discretion in admitting the testimony and, in the alternative, any error was harmless.  In supplemental briefing, the parties agree that defendant's one-year prior prison term enhancement should be stricken pursuant to Penal Code section 667.5, subdivision (b),[1] as amended by Senate Bill No. 136 (2019–2020 Reg. Sess.) (Senate Bill 136).  We strike the prior prison term enhancement and direct the trial court to prepare an amended abstract of judgment.  In all other respects we affirm.

## PROCEDURAL SUMMARY

On August 7, 2018,[2] the Fresno County District Attorney filed an information charging defendant with murder (§ 187; count 1).  The information alleged defendant used a deadly and dangerous weapon, a knife (§ 12022, subd. (b)(1)), had suffered a prior felony "strike" conviction within the meaning of the "Three Strikes" law (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)), and had served a prior prison term (§ 667.5, subd. (b)).

On October 30, the jury found defendant guilty of second degree murder and found true the allegation that defendant used a deadly and dangerous weapon, a knife.  On the same day, in a bifurcated proceeding, defendant admitted having suffered a prior strike conviction and having served a prior prison term.  The prior prison term was served for convictions of identity theft (§ 530.5), second degree burglary (§§ 459, 560, subd. (e)), and forgery (§ 475, subd. (c)).

---

[1]     All further statutory references are to the Penal Code unless otherwise stated.

[2]     All further dates refer to the year 2018 unless otherwise stated.

On January 24, 2019, the trial court sentenced defendant to a determinate term of two years plus an indeterminate term of 30 years to life in prison as follows: on count 1, 30 years (15 years to life doubled because of the prior strike), plus a one-year arming enhancement and a one-year prior prison term enhancement.

On January 28, 2019, defendant filed a notice of appeal.

## FACTUAL SUMMARY

*Prosecution's Case*

On the early morning of May 4, Baljit Sekhon was working as a cashier at a 24-hour market in southeast Fresno. Defendant was a regular customer at the market. He patronized the store every day and often sang in the store. At approximately 1:00 a.m. on the same day, defendant entered the market. While defendant was in the market, the victim entered the market, wearing a red sweatshirt, and purchased a three-pack of beer. Defendant talked with another regular customer who purchased him a cigar wrap, and defendant exited the market. On the same morning before 1:30 a.m., Sekhon called 911 because a different customer entered the store drunk and refused to leave when Sekhon would not sell him beer. Police officers responded to the call. At about 1:39 a.m. on the same morning, a group of nine or 10 men purchased items from the market and told Sekhon to keep the change. The group of men then left the market.

Surveillance video captured the interactions between defendant and the victim after they exited the market. The victim and defendant appeared to have had a conversation outside the market. Defendant then got onto his bicycle and began riding away from the victim. Defendant then dismounted his bicycle and began putting his gloves on as the victim walked toward him. The victim then lifted defendant's bike from the ground. Defendant pushed his bicycle into the victim and then punched the victim in the upper body using his left hand. The victim then rolled up his sleeves and defendant attempted to put on his second glove. The two men then continued to fist fight, and both

3.

fell to the ground. Both men stood up, adjusted their clothing, and continued to fight. During the fight, the victim threw a beer can at defendant.

On May 4, at about 1:00 a.m. or 1:30 a.m., Hector Esquivel and Julio Ceja drove to the market to buy beer. When they arrived, Esquivel and Ceja saw defendant and the victim fist fighting. Esquivel and Ceja did not know either combatant, but Esquivel attempted to stop the fight by shouting for them to back away from each other. The defendant and victim stopped fighting. Then the victim began "talking smack" to Esquivel, saying, "What's up? What are you going to do?" The victim also identified himself as a "Bond Street Bulldog" gang member. Esquivel told the victim that he was not a gang member, but said he would fight if the victim wanted to fight. Ceja told Esquivel not to fight the victim. Esquivel handed his glasses to Ceja and then began to fist fight with the victim. The fight began near Esquivel's car and moved toward the side of the market. Ceja followed Esquivel to stop the fight, but the victim grabbed Ceja's shirt. Esquivel punched the victim once or twice and he thought Ceja punched the victim once or twice. The victim hit Esquivel once in the shoulder. At the time of the fight, Esquivel did not know what defendant was doing. After watching the surveillance video of the fight, Esquivel saw that defendant was also involved in the fight with he and Ceja against the victim. Immediately before the fight ended, Esquivel faced the victim, Ceja was to Esquivel's right (facing the victim), and defendant was on Esquivel's left (also facing the victim). To end the fight, Esquivel threw the victim to the ground behind the market. Then, Esquivel and Ceja walked back to Esquivel's car. Ceja testified that, as he and Esquivel walked back to the car, defendant continued hitting the victim. After viewing the surveillance video, Ceja agreed that defendant did not continue hitting the victim after he and Esquivel walked away. The victim then stood up, walked toward the side of the market, and sat near the pay phones. Esquivel closed the trunk to his car, which he inadvertently opened with this remote during the fight, he and Ceja got into the car, and he drove away.

4.

Esquivel testified he did not have a weapon during the fight, and he did not believe that Ceja had a weapon. Ceja also testified he did not have a weapon and did not see Esquivel with a weapon. Neither Esquivel nor Ceja saw defendant with a weapon. After the fight, Esquivel had no blood on his hands or clothing and he saw no blood on Ceja. Ceja testified that he had no blood on his clothing and saw no blood on Esquivel's clothing.

About five or 10 minutes after Esquivel and Ceja left the market, they returned with four additional people to purchase beer. Esquivel brought additional people because he was afraid that the victim was going to return. The victim was sitting or lying on the curb near a pay phone and was moving his hands when they returned. Esquivel's group entered the market and purchased beer and sports drinks within about 10 or 15 minutes. Esquivel did not know that the victim had been stabbed until the next morning when he saw the news.

On May 4, at about 1:30 a.m., Fresno Police Officers Dylan Green and Billy Kincaid were dispatched to the southeast Fresno market in response to Sekhon's 911 call. After they resolved the situation with the intoxicated customer and began to leave, they were approached outside the market by a woman who informed them of the victim's unconscious body. The officers found the unconscious, nonresponsive victim lying facedown near the exterior southeast corner of the building. The officers rolled the victim over and saw a puncture wound on his lower abdomen and one on his upper chest. Green noted that there was "[v]ery little blood" and the blood that was found was "very dry." Green and Kincaid searched for a weapon, but did not find one at the scene. Kincaid noticed an odor of alcohol emanating from the victim.

Because the victim was not breathing, Green began chest compressions. Green rode in the ambulance with the victim to the hospital. At 2:12 a.m., the victim was declared dead.

5.

In the early morning of May 4, Fresno Police Detective Marcus Gray downloaded the surveillance video footage from the market between 1:00 a.m. and 2:20 a.m. on the same date. In reviewing the footage, Gray identified Esquivel's car and obtained a warrant to search his home. Later that day, Gray and four other officers searched Esquivel's home. The only knives found in Esquivel's home were kitchen knives. None of the knives appeared to have blood on them. Officers recovered several of Esquivel's security officer shirts, but none of the shirts had visible blood on them. Gray also had Esquivel's car towed. The car was later examined for any stains that might be blood. Stains from the seating area, the trunk, and the exterior of the car were tested for the presence of blood. Clothing recovered from the trunk was also tested for blood. No blood was detected on the clothing or tested areas.

On May 6, Fresno Police Detective Justin Hardy and Fresno Police Officer Tuan Tran responded to a call near the market, but unrelated to the victim's death. While on that call, they recognized defendant as he walked along a street. The officers stopped and searched defendant. Tran discovered a pocketknife in defendant's pocket. The knife was between three-quarters of an inch to an inch wide. The knife was disassembled and tested for the presence of blood. No blood was detected on the knife.

On the same date, Fresno Police Detective Mark Yee and other officers executed a search warrant of defendant's residence. Inside, Yee found a blue shirt, white gloves, and a baseball cap that appeared to be the same clothing defendant wore on the morning of the incident. The gloves were not tested for the presence of blood.

On May 11, officers arrested defendant.

Dr. Michael Chambliss performed the autopsy on the victim. The two stab wounds measured one-inch long by three-sixteenths of an inch wide and three-quarters of an inch long by three-sixteenths of an inch wide. One of the stab wounds struck the left ventricle of the victim's heart, causing his death. Chambliss examined the knife

6.

defendant carried on the day of his arrest and opined that it could have caused the victim's wounds.

***Defendant's Case***

Defendant testified that he lived about three blocks away from the market. He went to the market on May 4, in the early morning to purchase items on his way home. He encountered the victim in the market. Defendant purchased tea and the victim purchased a three-pack of beer. Defendant and the victim exited the market and the victim walked to the side of the market. The victim was visibly intoxicated, and defendant watched him quickly drink a full 25-ounce can of beer. The victim called to defendant by saying " 'What's up OG?' " Defendant walked to the victim and the victim asked him where he was from and whether he was "a crip or you a blood." Defendant denied any gang affiliation and the victim told him to " 'Go on about [his] way, then.' " Defendant walked away and retrieved his bicycle.

Soon after, defendant walked with his bicycle back toward the victim because he heard the victim talking to a homeless woman in a derogatory manner. He told the victim that he would get caught for an open container violation if he kept drinking beer in public. Defendant then talked to the homeless woman until the victim walked to defendant, tapped on his shoulder, and again asked where he was from. Defendant rode his bicycle away from the victim and then stopped. The victim walked to defendant and attempted to take his bicycle. Defendant pushed the bicycle into the victim and the two began to fist fight. The victim grabbed defendant's bicycle again and defendant tried to punch the victim but missed and fell onto the victim. During that exchange, defendant's belt broke and his pants fell. He lifted his pants and picked up his hat and slipper from where they fell in the fight. Defendant then put his gloves on to prepare for additional fighting. The two men fought again. The victim then threw a beer can at defendant but missed. Defendant walked to his bike, planning to leave, when the victim threw a second beer can at him, missing again. Defendant talked to the victim and tried to "diffuse the

situation," but the victim approached defendant, grabbed his bike tire, flung it, and swore at him.

Soon after, Esquivel and Ceja arrived, and Esquivel tried to break up the fight. The victim shouted "Bond Street Bulldog" at Esquivel and Esquivel responded he was not in a gang. Esquivel and the victim then spoke in Spanish as defendant backed away. The victim then challenged Esquivel and Ceja to fight. Esquivel and Ceja began fighting the victim. Defendant moved his bicycle to the front of the market, dropped the bicycle, and ran toward the fight to join in. Defendant was unable to join the fight because there was "no room" for him to make contact with the victim. Esquivel threw a punch and knocked the victim to the ground. Defendant taunted the victim as he lay on the ground. Defendant did not have a knife at that point and did not see Ceja or Esquivel with a knife. Defendant did not stab the victim. The victim quickly got to his feet as defendant, Ceja, and Esquivel stood around him. All three then retreated from the victim.

On May 6, when defendant was stopped by officers, he was carrying a utility knife that he used for gardening. He used the knife that day to repair a hose that his dog had damaged. He did not stab the victim with that knife.

## DISCUSSION

### A. Admission of Narration Testimony

Defendant contends that the trial court abused its discretion in admitting Yee's testimony narrating defendant making a "unique motion," extending his arm, while the victim was on the ground, and suggesting he had a knife and stabbed the victim. He argues that Yee's testimony should have been excluded (1) under Evidence Code section 352 because it was cumulative and (2) because it was improper lay opinion testimony which "invaded the province of the jury."

#### 1. Additional Background

Prior to trial, defendant moved to exclude, pursuant to Evidence Code section 352, "testimony of any officer concerning where in the surveillance video the alleged stabbing

8.

occurred."  He argued, "the video is the evidence, not the opinion or belief of detective Yee concerning what is seen in the video."  The trial court preliminarily ruled that Yee was permitted "to describe thrusting motions and from his experience [whether] there is any differentiation between a punch and a thrust ….  [But then it reserved] the ultimate question, did the defendant have a knife, … for the jurors to decide."  After viewing the surveillance video and listening to Yee's testimony outside the presence of the jury, the court affirmed and clarified its preliminary ruling—Yee was permitted to describe the "unique motion" defendant made and demonstrate the motion for the jury, but was not permitted to call the motion a "stab" or opine that defendant had a knife.

During the prosecution's case-in-chief, Yee—who testified that he had investigated over 200 homicide cases and watched the surveillance video of the fight in this case over 100 times—was asked to watch the video and describe several of defendant's movements.  Directing Yee to a specific portion of the video depicting defendant standing near the victim before Esquivel and Ceja arrived but after the fight between defendant and the victim began, the prosecutor asked what Yee "notice[d] about the use or movement of [defendant]'s hands at th[at] moment in the video."  Yee responded:

> "At this time, um, [defendant] in particular is keeping his left hand to his back near the left hip area and maintaining it in that position pretty much the entire time as he's stepping toward and advancing on [the victim].  His right hand is grasping an object of some sort.  He's waiving that around on a couple of occasions but the left hand is not really moving.  It's behind his back and hip."

The prosecutor then emphasized that Yee testified he had "seen [defendant] throw punches [and] … move his hands in demonstrative ways," and asked Yee to describe defendant's movements as defendant, Esquivel, and Ceja stood around the victim after he was thrown to the ground.  Yee did so:

> "[Defendant] stepped towards the group, including the victim who was on the ground at that point, and bent over and moved his right hand

9.

forward away from his body straight in the direction of where that individual is laying. [¶] … [¶] [Defendant] is away. And then right there is when he bends and put his hand forward away from his body."

## 2. Opinion Testimony

First, defendant and the People disagree regarding whether Yee's narration testimony of defendant's movements in the video constitutes opinion testimony. The People contend that "Yee merely testified about what he observed in the surveillance video by describing the physical actions that appellant took during the incident." If the testimony was opinion testimony, the People contend, the trial court's decision to admit it "should nonetheless be affirmed because appellant was given sufficient opportunity to cross-examin[e] Yee." Defendant, on the other hand, contends that Yee's testimony was opinion, and if it was not an opinion, it was otherwise inadmissible because Yee had no personal knowledge of the events depicted in the video. We agree with the People that Yee's testimony was not opinion testimony and, assuming it was opinion testimony, it was nevertheless admissible.

The Fourth District recently addressed this issue in a nearly identical case. In *People v. Son* (2020) 56 Cal.App.5th 689, 693 (*Son*), the defendant was caught on a surveillance video attacking the murder victim. At trial, a homicide detective testified that she watched the video over 50 times and narrated what she perceived in the surveillance video. (*Ibid.*) She observed the defendant make " '[a] thrusting motion that appeared to be a stabbing motion' " four times at the victim's upper body, and noted that "[i]t appeared … [the] defendant held a shiny object in his right hand" when he made the thrusting motions. (*Ibid.*) On appeal, the defendant contended, inter alia, that the detective's testimony was inadmissible lay opinion. (*Son*, at p. 696.)

As we do now, the Court of Appeal in *Son* explained that a lay witness may only offer an opinion if the opinion is "[r]ationally based on the perception of the witness" and

10.

"[h]elpful to a clear understanding of his testimony."[3] (Evid. Code, § 800; *Son*, *supra*, 56 Cal.App.5th at p. 696.) The *Son* court then explained that it "fail[ed] to see any opinions expressed in Detective Ramirez's testimony. She essentially just testified to what she saw." (*Son*, at p. 697.) The court commented that, if the detective "had witnessed the actual murder and given the exact same testimony, [the court] certainly would not characterize it as opinion testimony. It would be percipient testimony. Why does it become an opinion just because she saw it in a video?" (*Ibid.*)

The *Son* court continued, "assuming, for the sake of argument, that [the detective's] testimony d[id] consist of opinion testimony, the [trial] court did not abuse its discretion in finding that it was helpful for the jury. [The] [d]etective … testified she watched the video at least 50 times and that subsequent viewings revealed details she had not picked up on at first. While it is true, as defendant argues, that the jury could have watched the video repeatedly and picked those details up on their own, the standard is not whether the testimony was essential. It[ is] whether it was helpful. Here, the jury was able to speed up the process of teasing out obscure details in the video with the aid of Detective Ramirez's testimony. That was helpful."[4] (*Son*, *supra*, 56 Cal.App.5th at p. 697.) We agree with that reasoning.

---

**3**    All lay witness testimony (including lay opinion testimony) that goes beyond the facts the witness personally observed, is inadmissible. (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1308; Evid. Code, § 702, subd. (a) [Except for expert witness testimony, "the testimony of a witness concerning a particular matter is inadmissible unless he has personal knowledge of the matter."].)

**4**    The *Son* court also noted that its decision was consistent with federal case law on video narration. (*Son*, *supra*, 56 Cal.App.5th at p. 697.) In *U.S. v. Torralba-Mendia* (9th Cir. 2015) 784 F.3d 652 and *U.S. v. Begay* (9th Cir. 1994) 42 F.3d 486, the Court of Appeals approved narration of a video by an officer who had extensively reviewed that video. Such narration allows an officer to "point[] out particulars that a casual observer might not see" (*Torralba-Mendia*, at p. 659) and aid the jury by avoiding "inefficient use

Here, Yee did not personally observe the fight between defendant, Esquivel, Ceja, and the victim, but he did review the surveillance video over 100 times. The video was introduced into evidence and the jury was responsible for determining whether the video showed who may have stabbed the victim. However, as was the case in *Son*, Yee's testimony merely described the movements defendant made in the video as it was played. We do not see Yee's testimony as opinion testimony. (*Son*, *supra*, 56 Cal.App.5th at p. 697.) Even assuming it was lay opinion testimony, it was admissible because it helped the jury understand the video. (*Ibid*.)

### 3. Evidence Code, section 352

Next, defendant contends that Yee's narration testimony should have been excluded pursuant to Evidence Code section 352 because the testimony prejudiced defendant by allowing the prosecutor to exercise "improper influence," "raise[d] 'the very real prospect of confusing or misleading the jury,' " was "cumulative to the video itself[,]" and was not relevant because "Yee was not a percipient witness." We disagree. The trial court's decision to admit the challenged testimony was not an abuse of discretion.

" 'Under Evidence Code section 352, the trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion, or consumption of time. [Citation.]' [Citation.] 'A trial court's discretionary ruling under Evidence Code section 352 will not be disturbed on appeal absent an abuse of discretion.' " (*People v. Clark* (2016) 63 Cal.4th 552, 586; accord, *People v. Suff* (2014) 58 Cal.4th 1013, 1066.)

As noted, the trial court considered defendant's objections in its hearing on motions in limine. The court precluded Yee from suggesting defendant held a knife or

---

of the jury's" time (*Begay*, at p. 503). In those ways, the testimony is helpful to the jury. (*Son*, at p. 697.)

stabbed the victim. The court limited Yee's narration to describing (or demonstrating) the "unique motion" defendant made toward the victim and testifying that defendant appeared to be holding something behind his back. The court left to the jury the task of determining what defendant held behind his back and the significance of defendant's unique motion. When Yee described defendant's movements, the video played along with his description.

On this record, there was little risk of confusing or misleading the jury because the jury was able to watch the video as Yee described what he believed was taking place. (See *People v. Leon* (2015) 61 Cal.4th 569, 601 [The trial court did not abuse its discretion in allowing an officer to identify the defendant in a surveillance video "because the surveillance video was played for the jury,[ so] jurors could make up their own minds about whether the person shown was defendant."]; *People v. Larkins* (2011) 199 Cal.App.4th 1059, 1068 ["[T]he jurors were able to test the [lay witness's] opinion that defendant was the person in the … videos" because jurors were shown some of the videos.].) Moreover, the testimony was not cumulative for the same reason that it was relevant and helpful to the jury—because the narration allowed Yee to "point[] out particulars that a casual observer might not see" (*Torralba-Mendia*, *supra*, 784 F.3d at p. 659) and aid the jury by avoiding "inefficient use of the jury's" time (*U.S. v. Begay*, *supra*, 42 F.3d at p. 503). We cannot conclude that the trial court abused its broad discretion in permitting Yee to provide a limited narration of the surveillance video.

## B. Senate Bill 136

Defendant argues his prior prison term enhancement must be stricken based on the retroactive application of Senate Bill 136. The People agree, as do we.

Effective January 1, 2020, Senate Bill 136 amended section 667.5, subdivision (b) to limit application of prior prison term enhancements to only prior prison terms that were served for sexually violent offenses as defined by Welfare and Institutions Code section 6600, subdivision (b). (§ 667.5, subd. (b).) (Stats. 2019, ch. 590, § 1.) That

amendment applies retroactively to all cases not yet final on Senate Bill 136's effective date. (*People v. Lopez* (2019) 42 Cal.App.5th 337, 341–342, citing *In re Estrada* (1965) 63 Cal.2d 740, 742.)

Here, the trial court imposed a one-year section 667.5, subdivision (b) prior prison term enhancement for a term served for convictions of identity theft (§ 530.5), second degree burglary (§§ 459, 560, subd. (e)), and forgery (§ 475, subd. (c)), none of which is a sexually violent offense as defined in Welfare and Institutions Code section 6600, subdivision (b). On January 1, 2020, defendant's case was not yet final. Therefore, as the parties agree, defendant is entitled to the ameliorative benefit of Senate Bill 136's amendment to section 667.5, subdivision (b). We therefore strike defendant's prior prison term enhancement.

Where an appellate court strikes a portion of a sentence, remand for " 'a full resentencing as to all counts is [generally] appropriate, so the trial court can exercise its sentencing discretion in light of the changed circumstances.' " (*People v. Buycks* (2018) 5 Cal.5th 857, 893.) However, where a trial court imposed the maximum possible sentence, remand for the court to consider alternative sentencing options is unnecessary. (*People v. Lopez*, *supra*, 42 Cal.App.5th at p. 342.)

Here, the trial court imposed the maximum possible sentence and therefore remand is unnecessary. Accordingly, we strike the prior prison term enhancement and direct the trial court to prepare an amended abstract of judgment.

## DISPOSITION

Defendant's prior prison term enhancement (§ 667.5, subd. (b)) is stricken. The trial court is directed to prepare an amended abstract of judgment. The court shall forward a copy of the amended abstract of judgment to the appropriate entities. As so modified, the judgment is affirmed.